IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JIMMY DALE MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Case No. 11-cv-436-MJR |
| | ) | |
| WARDEN RYKER, WARDEN HODGES, | ) | |
| WARDEN CAMPANELLA, PHILLIP | ) | |
| MARTIN, *Health Care Director*, MS. | ) | |
| CUNNINGHAM, *Director of Nursing*, MR. | ) | |
| BLEVINGS, *Nurse*, MS. GOBLE, *Nurse*, | ) | |
| MS. REED, *Nurse*, MS. KIMMEL, *Nurse*, | ) | |
| MS. JARRAD, *Nurse*, MS. CLEVY, *Nurse*, | ) | |
| MS. LINDA CUSICK, *Nurse*, MR. HIG- | ) | |
| GINS, *Nurse*, MR. DOWNEN, *Corr. Coun-* | ) | |
| *selor*, CECIL VAUGHN, *Corr. Counselor*, | ) | |
| MR. REESE, *Corr. Counselor*, MR. JOHN- | ) | |
| SON, *Corr. Officer*, MR. AUSHBROOK, | ) | |
| *Corr. Counselor*, MR. D. LINE, *Corr. Offi-* | ) | |
| *cer*, MR. KESSEL, *Officer*, LT. WALTERS, | ) | |
| LT. JAMES J. OCHS, LT. T. STUCK, MR. | ) | |
| CASHBURN, *Corr. Officer*, MR. BUTCH- | ) | |
| ER, *Lawrence Corr. Cntr. Plumber*, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER

REAGAN, District Judge:

Plaintiff, a prisoner at Pinckneyville Correctional Center, brings this pro se civil

rights action pursuant to 42 U.S.C. § 1983 for incidents that took place while he was temporarily

housed at Lawrenceville Correctional Center. This case is now before the Court for a preliminary

review of the complaint pursuant to 28 U.S.C. § 1915A, which provides:

**(a) Screening.**— The court shall review, before docketing, if feasible or, in any
event, as soon as practicable after docketing, a complaint in a civil action in which

a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.

**(b) Grounds for Dismissal.**— On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—

> **(1)** is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
>
> **(2)** seeks monetary relief from a defendant who is immune from such relief.

An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court is obligated to accept factual allegations as true, *Smith v. Peters*, 631 F.3d 418, 419 (7th Cir. 2011), some factual allegations may be so sketchy or implausible that they fail to provide sufficient notice of the plaintiff's claim, *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Additionally, courts "should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Brooks*, 578 F.3d at 581. At the same time, however, the factual allegations of a pro se complaint are to be construed liberally. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir.2009).

Upon careful review of the amended complaint, the Court finds it appropriate to exercise its authority under § 1915A; portions of this action are subject to summary dismissal.

## Counts 1, 2, 4: Deliberate Indifference to Serious Medical Needs

Plaintiff brings four closely related claims based on deliberate indifference to his serious medical needs. The facts from his amended complaint (Doc. 16) are as follows:

Plaintiff was transferred to Lawrence Correctional Center on November 23, 2010. During the medical screening at Lawrence, he told medical personnel he was taking Rantitide (generic for Zantax) for acid reflux. His prescription had expired, however, and he had not had time to refill it before his transfer. He also told them he had contracted an infection while he was in an unsanitary cell at Pontiac Correctional Center. Doctors had diagnosed Plaintiff with a staph infection or MRSA. In addition, Plaintiff had an undiagnosed condition that made his body break out in painful boils. The medical personnel told Plaintiff to put in for sick call. He did, but was not called. About a month later, on December 28, 2010, Plaintiff did get called to sick call. He pleaded with the nurse that he needed Zantax. He felt a constant burning in his stomach. Plaintiff believes he was given a bottle of Maylox [*sic*] at an earlier visit to sick call. He told the nurse that Maylox was not working. The nurse had him fill out another money voucher.

Two days later, on December 30, Plaintiff called C.O. Aushbrook and told Aushbrook he was in great pain because he did not have his Rantitide. Plaintiff said he needed to see a nurse. Aushbrook said they would immediately speak to the nurse or sick call.

After orientation,[1] Plaintiff spoke with the director of nursing, Ms. Cunningham. He told her he had staph or MRSA. He explained that he had an untreated boil condition. He also told her about not having his Rantitide prescription for acid reflux and that he was in great pain every night. Cunningham informed Plaintiff that once an inmate files a money voucher for sick call on the same issue more than three times, he will automatically be scheduled to see a doctor. Cunningham took his name and number but Plaintiff was never called.

---

[1] Plaintiff does not say when this orientation was.

On December 31, 2010, at 5:00 a.m., while Nurse Blevings was seeing Plaintiff's cellmate because he was having an asthma attack, Plaintiff tried to tell Blevings about his stomach pain. Blevings told him to drop a sick-call slip. Plaintiff replied that he had done that several times already. Blevings refused to speak further to Plaintiff.

On January 6, 2011, Plaintiff told Nurse Goble about his stomach pain while she was passing out evening medications. He said he had been scheduled to see a doctor about his stomach pain and Rantitide renewal, but the facility went on lock down. He had not had his Rantitide since November 23. He said he couldn't sleep at night and that he forced himself to drink warm water every night to curb the pain. He asked to see a doctor. Goble told him to drop a sick-call slip. Plaintiff said he had already done that several times. He then gave Goble a sick-call slip but was never called to health care.

On January 8, Plaintiff awoke at 1:20 a.m. with intense pain in his stomach, rectum, and scrotum. The pain was so intense that Plaintiff believes his innards were being pushed out. He pushed the medical emergency button repeatedly, but no one responded. He could not yell, kick, or move much because the slightest movement aggravated the pain. At 3:45 a.m., C.O. Johnson came to his cell. Plaintiff explained his medical emergency. Johnson responded, "If you're not complaining of chest pain, not bleeding, breathing, or dying, they're not going to respond" (Doc. 16, p. 12). He told Plaintiff to say something to the nurse at 5:00 a.m. when she makes her rounds.

Plaintiff asked Johnson why no one responded to the emergency button. Johnson explained that the button only makes a light come on a panel, and if no one sees the light, no one would respond (Doc. 16, p. 12). Plaintiff said he'd been pushing the button for over an hour. "Well, I know now," Johnson said. He would have the nurse come see Plaintiff when she gets

there. At about 5:00 a.m., Johnson returned with Nurse Reed. Plaintiff told Reed what had hap-pened, and she said to drop a sick-call slip. Plaintiff explained his history and asked Reed if she could give him something for the intense pain. Reed said she would not pull Plaintiff out and give him special care. Plaintiff said he was in pain, to which Reed replied, "So is everybody else!" (Doc. 16, p. 13). She and Johnson then left.

The next day, January 9, Plaintiff was called to sick call by Nurse Kimmel. He explained what had happened the night before and his intense stomach pain and need for Ranti-tide. He told her he was constipated, which was also painful. Kimmel abruptly gave Plaintiff a money voucher. Plaintiff was frustrated and refused to sign it because he was filling out a money voucher for medical payment but not being treated. Kimmel asked if Plaintiff was refusing medi-cal treatment. No, Plaintiff said, but he wouldn't fill out more money vouchers. Kimmel said every time she sees Plaintiff, he has to pay. If he wanted treatment, he would have to pay. When Plaintiff refused to pay or sign a voucher, Kimmel ordered an officer to lock Plaintiff up and said, "There's no free medical treatment!" (Doc. 16, p. 14).

On January 17, 2011, Plaintiff spoke with Nurse Cusick for a second time. She took down Plaintiff's information, but he was not called or given medical treatment. On January 20, Plaintiff explained to Counselor Downen that he was having difficulty getting medical atten-tion and that he was in great pain every night from not having his medication. He had not been able to see a doctor yet. He had an appointment with one, but it was canceled. Plaintiff told Downen he had filed a grievance, and Downen said, "Well, you're not going to like my re-sponse," because he had to agree with whatever health care's response was to the grievance. Again Plaintiff said he was in great pain every night and asked if Downen could talk to health

care. "No, you'll have to drop a sick-call request," Downen said (Doc. 16, p. 16). Plaintiff spoke to Nurse Higgins on January 21 about needing medical attention, but Higgins "did nothing."

On January 23, Plaintiff again awoke at 3:30 a.m. with excruciating pain in his stomach. He repeatedly pushed the emergency button. He threw up stomach acids and fluids. He had a painful boil in his left nostril and the left side of his face was swollen. About an hour later, C.O. Line came, and Plaintiff told him he was having a boil outbreak and he was throwing up. He needed to see a doctor. Line told Plaintiff, "You're talking to me, you're not bleeding, you're not dying, so it's not an emergency. When the nurse does sick call you can see her then!"

Plaintiff wrote Warden Campanella an extensive letter on January 24. She did not respond, but Plaintiff's cellmate told him Campanella came looking for Plaintiff while he was away. Campanella did not return, however. Plaintiff sent a request to Director of Health Care, Mr. Phillip Martin, and did not receive a response. While on his way to a class, Plaintiff saw Warden Hodges. He asked if he could speak with Hodges about his serious medical condition. Hodges asked an officer, "Did you see him on my appointment list?" and walked away.

Ultimately, "after several months," Plaintiff says he was called to see a doctor, given blood tests, and his medication was ordered. He received medication for his staph infection or MRSA, and Rantitide for acid reflux. On February 10, 2011, he received the results from a blood test for his stomach pain, and he tested positive for H-Pylori virus. Shortly after he received those test results, he was prescribed antibiotics. He asked Nurse Clevy for the antibiotics while she was handing out medication, but Clevy said he would get them when they come in; there were 20 other inmates with stomach virus. There was nothing she could do, she said. Plaintiff did not receive the antibiotics until a month after he was transferred back to Pontiac Correctional Center.

Plaintiff describes another event in which he was denied medical treatment. He was in a fight with another inmate on January 28, 2011. Both inmates fell down a flight of stairs. Lt. James J. Ochs looked at Plaintiff's hands and said, "Oh, he's all right!" then took Plaintiff to segregation. Plaintiff discovered he had injured his left pinky, middle, and index fingers, and that there was skin breakage. He asked Ochs for medical attention. Ochs replied that Plaintiff had refused medical attention. When Plaintiff was put in a cell, he noticed his left thumb had doubled in size and was difficult to move. He saw Counselor Vaughn making rounds and showed Vaughn his left hand. He explained the fight and fall down the stairs. Plaintiff said he needed a tetanus shot and an X-ray on his hand. Vaughn took down Plaintiff's name, but did not return, and no one came to examine Plaintiff. Plaintiff looked through the crack of his door and saw Lt. Walters. He yelled to Walters about the fight and said he needed an X-ray. He said his hand was swollen and hurting. Walters said "No!" and left. Later, C.O. Shidler passed by while delivering lunch, and Plaintiff told him about the incident and that he needed to see a nurse. Shidler said he was sorry, he couldn't. He heard Plaintiff had refused medical treatment, so he could only tell Plaintiff to fill out a sick-call request. He brought Plaintiff a pen and request slip and grievances. Plaintiff says he asked an unknown nurse for help, too, while she was passing out medication, but she told him to fill out a sick-call request.

**Analysis**

In Count 1, Plaintiff claims he notified medical personnel of his constant pain from acid reflux and not having Rantitide. He says Martin, Cunningham, Blevings, Goble, Reed, Kimmel, Jarrad, Clevy, Cusick, and Higgins are all medical personnel who denied him medication for his acid reflux and antibiotics for H-Pylori virus. As a result, Plaintiff was in excruciat-

ing pain in his stomach, scrotum, and rectum; constipated; and suffered emotional distress for several months. Similarly, Plaintiff alleges in Count 2 that he informed the Defendants above as well as Campanella, Downen, Johnson, Aushbrook, Line, Walters, and Ochs of his stomach pain, injuries, and needing medical attention, but they were deliberately indifferent to his serious medical needs. In Count 4 Plaintiff alleges he spoke with or wrote to Martin, Cunningham, Blevings, Goble, Reed, Kimmel, Jarrad, Clevy, Cusick, Higgins, Campanella, Ryker, and Hodges, but they denied, delayed, or canceled Plaintiff's doctor appointments. He says whenever he contacted medical personnel, they took down his name but never followed up to provide medical care.

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994); *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). This encompasses a broader range of conduct than intentional denial of necessary medical treatment, but stops short of "negligen[ce] in diagnosing or treating a medical condition." *Estelle*, 429 U.S. at 106; *see also Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir.2001).

> To prevail on an Eighth Amendment claim, a plaintiff must show that the responsible prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999). Deliberate indifference involves a two-part test. The plaintiff must show that (1) the medical condition was objectively serious, and (2) the state officials acted with deliberate indifference to his medical needs, which is a subjective standard.

*Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir.2000).

The Seventh Circuit considers the following to be indications that a medical condition is objectively serious: (1) where failure to treat the condition could "result in further significant injury or the unnecessary and wanton infliction of pain"; (2) the "[e]xistence of an injury that a

reasonable doctor or patient would find important and worthy of comment or treatment"; (3) the

"presence of a medical condition that significantly affects an individual's daily activities"; or (4)

the "existence of chronic and substantial pain." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th

Cir. 1997) (internal quotations and citations omitted).

Regarding the subjective standard of deliberate indifference, the Supreme Court stressed

it is not an insurmountable hurdle:

> [A]n Eighth Amendment claimant need not show that a prison official acted or
> failed to act believing that harm actually would befall an inmate; it is enough that
> the official acted or failed to act despite his knowledge of a substantial risk of se-
> rious harm … . Whether a prison official had the requisite knowledge of a sub-
> stantial risk is a question of fact subject to demonstration in the usual ways, in-
> cluding inference from circumstantial evidence … and a factfinder may conclude
> that a prison official knew of a substantial risk from the very fact that the risk was
> obvious.

*Farmer*, 511 U.S. at 842. The Seventh Circuit's decisions following this standard for deliberate

indifference in the denial or delay of medical care require evidence of a defendant's actual

knowledge of, or reckless disregard for, a substantial risk of harm. *See Chavez v. Cady*, 207 F.3d

901, 906 (7th Cir.2000) (officers were on notice of seriousness of condition of prisoner with rup-

tured appendix because he "did his part to let the officers know he was suffering"). Inadvertent

error, negligence, or even ordinary malpractice is insufficient to rise to the level of an Eighth

Amendment constitutional violation. See *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th

Cir.2008).

Here, Plaintiff mentions at various times having had an unknown infection, H-

Pylori virus, constipation, a staph infection (or MRSA), painful boils, and an injured hand. Plain-

tiff does not offer much information about these conditions. He mentions constipation only a

couple of times. He says an infection caused him to break out in painful boils, but he only de-

scribes having had one boil (in his left nostril) during his time at Lawrence. He alleges that he in-

jured his hand in a fight on January 28, 2011, and that it became swollen and was hurting. He apparently only asked people for X-rays and medical treatment that one day, however, because after that he doesn't mention his hand. He does not say whether anything was broken or what became of the injury. He was diagnosed with H-Pylori virus in February, but says only that Nurse Clevy did not bring him his prescribed antibiotics when she was delivering medication sometime after that. She said that he would get the antibiotics when they came in. Plaintiff did not receive them until a month after he was transferred. Plaintiff does not suggest that the failure to treat any of these conditions resulted in further significant injury or the unnecessary and wanton infliction of pain. He does not appear to have suffered from chronic and substantial pain either. Consequently, the Court finds that Plaintiff has not shown that they were objectively serious medical conditions. Accordingly, as to these conditions, Plaintiff fails to state a claim upon which relief can be granted.

Before moving on, the Court notes that Plaintiff does not include C.O. Shidler in the caption of his complaint or as a defendant under Counts 1, 2, or 4. So it does not appear that Plaintiff intended to file a claim against Shidler. Since Plaintiff only mentions Shidler in connection with his hand injury, which the Court finds was not objectively serious, the Court will not add Shidler as a defendant.

Regarding his stomach pain, Plaintiff persistently describes the pain and acid reflux and his need for Rantitide, but it is impossible to discern whether the stomach pain was caused by acid reflux, H-Pylori virus, or something else. The Court will therefore treat the stomach pain, whatever the cause was, as the medical condition. And the Court does find that Plaintiff's stomach pain may have been an objectively serious medical condition.

Plaintiff felt "constant burning," in his stomach, was in "great pain" every night, and woke up at night in intense pain (so intense that he believed his insides were being pushed out). He forced himself to drink warm water every night to curb the pain. He woke up one night and vomited stomach acids. These facts indicate that the failure to treat the condition resulted in the unnecessary and wanton infliction of pain. They also show the existence of chronic and substantial pain. Further, Plaintiff was prescribed Rantitide before his transfer and again after several months at Lawrence, which suggests the existence of a condition that a reasonable doctor would find worthy of treatment.

Still, to state a claim for relief Plaintiff must show that the state officials acted with deliberate indifference. Plaintiff's allegation against C.O. Aushbrook does not plead enough facts to state a claim to relief that is plausible on its face. Plaintiff only says he told Aushbrook that he was in great pain, and Aushbrook responded that they would immediately speak to the nurse or sick call. Plaintiff does not say whether he saw a nurse after that. Plaintiff also relates that he "tried to tell" Nurse Blevings about his stomach pain while Blevings was treating his cellmate for an asthma attack. The Court does not find that these allegations plausibly suggest Blevings was deliberately indifferent. If Plaintiff only tried to tell Blevings, then Blevings would not have had actual knowledge of Plaintiff's stomach pain. Moreover, Blevings was there to treat Plaintiff's cellmate, not Plaintiff. Aushbrook and Blevings are dismissed without prejudice.

Plaintiff has not stated a claim against C.O. Johnson, either. Johnson did not come to Plaintiff while he was pushing the emergency button because he did not see the light on the panel. That only pleads negligence, not deliberate indifference. Once Johnson talked to Plaintiff, he acted reasonably by bringing Nurse Reed as soon as she came in, an hour and 45 minutes later. *See Farmer*, 511 U.S. at 844 (prison officials are free of liability if they respond reasonably to

a substantial risk even when harm is not ultimately averted). Even though Reed did not actually treat Plaintiff, Johnson was entitled to rely on Reed's medical judgment.

By contrast, C.O. Line did not bring a nurse to see Plaintiff or contact medical staff. Plaintiff had woken up in excruciating pain and pushed the emergency button repeatedly. He was throwing up. When he told Line he needed to see a doctor, Line said he would have to wait for sick call. Plaintiff's claim against Line merits further review.

Plaintiff gave a seemingly full account of his medical history to Director Cunningham, including that he was in "great pain" every night. Cunningham took down his name, but Plaintiff was not called to sick call. Likewise, Plaintiff described his condition fully to Nurse Goble, saying he couldn't sleep at night and had to force himself to drink warm water. Goble took a sick-call slip from Plaintiff, but Plaintiff was not called to health care. Nurse Reed came to Plaintiff's cell after he woke up in "intense pain" at 1:20 a.m. Plaintiff told her about his medical history and the pain he was in. Reed, however, said she would not give Plaintiff special care. A day later, Plaintiff saw Nurse Kimmel. He explained all the details of the previous night, but Kimmel said she would not treat Plaintiff unless he filled out a voucher for payment. Plaintiff saw Nurse Cusick twice without being given medical treatment. He also explained to Counselor Downen the pain he was in and the difficulty he was having getting any medical treatment. Plaintiff saw Nurse Higgins on January 21, but Higgins "did nothing." The Court finds that these Defendants may have had actual knowledge of, or reckless disregard for, a substantial risk of harm. Under the circumstances described, Plaintiff's claims against Cunningham, Goble, Reed, Kimmel, Cusick, Downen, Line, and Higgins warrant further review.

Plaintiff wrote a letter to Warden Campanella and sent a request to the Director of Health Care, Phillip Martin. An inmate's letters to officials setting out a medical problem can put

officials on notice of the problem. *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999). Therefore, Plaintiff's claims against Campanella and Martin warrant further review.

    As to Warden Hodges, Plaintiff's complaint only alleges in one paragraph that he asked to speak with Hodges "about his serious medical condition" as he passed Hodges on his way to a class. The Court does not find that this allegation is sufficient to have given Hodges actual knowledge of a substantial risk of harm, and supervisory liability does not apply to § 1983 actions, *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir.2009); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir.2001). Plaintiff's claim against Hodges is dismissed without prejudice.


**Count 3: Inadequate Access to Emergency Medical Treatment**

    Count 3 states that Defendants Campanella, Hodges, Ryker, Cunningham, and Martin, as wardens and medical officers, and Johnson and Line, as correctional officers, have the authority to implement a policy giving inmates access to emergency medical treatment. On two occasions, Plaintiff repeatedly pushed the emergency button in his cell for hours while his stomach was in extreme pain. The officers on duty can only see a light on a panel when the button is pushed—they do not hear any sound. Therefore, Plaintiff says, Defendants' current policies do not ensure careful monitoring and denied Plaintiff access to emergency medical treatment.

    Plaintiff fails to state a claim that the Defendants acted with deliberate indifference to his serious medical needs. He has not shown that the Defendants acted with the requisite culpable state of mind to constitute deliberate indifference. *See Ware v. Uchtman*, Civil No. 06-468-GPM, 2007 WL 2068321, at *3 (S.D. Ill. July 16, 2007) (dismissing deliberate-indifference claim alleging the defendant had not installed emergency call buttons in asthmatics' cells). Further, it is not enough to allege the Defendants had the authority to implement a different policy.

Plaintiff must show the Defendants were personally responsible for a constitutional deprivation. *Sanville*, 266 F.3d at 740. Accordingly, Count 3 is dismissed without prejudice.

**Count 5: Inhumane Living Conditions**

In Count 5, plaintiff says he was subjected to inhumane living conditions. He brings this claim against wardens Ryker, Hodges, and Campanella; correctional officers Kessel and Cashburn; lieutenants Walters and Stuck; and the plumber, Butcher.

The first cell Plaintiff was in was extremely cold when he woke up at 9:00 one night. No heat was coming from the heater. He says the cell was unnaturally cold, especially at night. He asked to be moved or given an extra blanket, but was denied. The cell was filthy where someone had spit in the corner. The cell smelled like urine. Plaintiff says he was in that condition for about five days until he received his property (cosmetics).

Plaintiff was moved to a new cell in segregation on February 1, 2011. This cell did not have heat either. His cellmate put a rag in the spout of the sink to stop the water from running, and about two days later the rag was rust colored. Plaintiff was afraid to drink the water, yet he needed to drink a lot of it with his medications. There was no hot water, and the water was freezing cold. He had to rely on a weekly shower to wash, and even that water was cold and took a long time to warm up.

Plaintiff called C.O. Cashburn about the water being contaminated, and Cashburn told him "Welcome to Lawrence County where you can drink the best mineral water in the state. So drink up, it's good for you!" (Doc. 16, p. 24). Plaintiff also told the plumber, Mr. Butcher, about leaks and not having hot water. Butcher said he would get around to it when he gets to it, but he has the whole compound to worry about (*id.*). On February 3, 2011, Plaintiff spoke with

14

Lt. Stuck about the water, and said he was thirsty but afraid to drink it. He showed Stuck the rust-soaked rag. Stuck told him that everybody was complaining of the same thing; the plumber was taking his time. Plaintiff asked if he could be moved to a different cell with clean water, but Stuck refused to do that. Plaintiff complained to C.O. Kessel about the rusty water. Kessel asked what Plaintiff wanted him to do about it. Plaintiff said he was supposed to get milk because he couldn't drink the water. Kessel refused and said "What they send you is what you get."

Butcher returned on February 7, and Plaintiff again told him about not having hot water and about the rusty water. Butcher asked if Plaintiff had put in a work order. Plaintiff said he had talked to several officers and filed two grievances (about the heat and cell conditions). Butcher said he doesn't work on grievances; he works on work orders. Plaintiff asked, "Since I wrote a grievance you won't fix the problem?" Butcher answered, "Yep." He then added that Plaintiff could fix the problem by staying out of segregation, and as far as Butcher was concerned, everything was working perfectly ("I know. I run it!"). "If you have a problem, put in a work order. A grievance is not a work order," he said (Doc. 16, p. 30).

Plaintiff filed "an extensive complaint" with wardens Ryker, Hodges, and Campanella. When he spoke with Ryker about the conditions, Ryker told him to be patient.


**Analysis**

Inhumane conditions of confinement may give rise to a civil-rights claim under the Eighth Amendment's prohibition against cruel and unusual punishment, which is applicable to the states through the Fourteenth Amendment. Not all prison conditions trigger Eighth Amendment scrutiny—only deprivations of basic human needs like food, medical care, sanitation, and physical safety. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *see also James v. Mil-*

*waukee Cnty.*, 956 F.2d 696, 699 (7th Cir.1992). In order to prevail on a conditions-of-confinement claim, a plaintiff must allege facts that, if true, would satisfy the objective and subjective components applicable to all Eighth Amendment claims. *McNeil v. Lane*, 16 F.3d 123, 124 (7th Cir.1994); *see also Wilson v. Seiter*, 501 U.S. 294, 302 (1991).

The objective component examines whether the conditions of confinement exceeded contemporary bounds of decency of a mature civilized society. *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir.1992). The conditions must result in unquestioned and serious deprivations of basic human needs or deprive inmates of the minimal civilized measure of life's necessities. *Rhodes*, 452 U.S. at 347; *Jamison–Bey v. Thieret*, 867 F.2d 1046, 1048 (7th Cir.1989); *Meriwether v. Faulkner*, 821 F.2d 408, 416 (7th Cir.1987). The subjective component of unconstitutional punishment examines the intent with which the acts or practices constituting the alleged punishment are inflicted. *Jackson*, 955 F.2d at 22. This requires that a prison official had a sufficiently culpable state of mind. *Wilson*, 501 U.S. at 298; *see also McNeil*, 16 F.3d at 124. The relevant state of mind is deliberate indifference to inmate health or safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he also must draw the inference. *See, e.g.*, *Farmer*, 511 U.S. at 837; *Wilson*, 501 U.S. at 303; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *DelRaine v. Williford*, 32 F.3d 1024, 1032 (7th Cir.1994). The deliberate-indifference standard is satisfied if the plaintiff shows that the prison official acted or failed to act despite the official's knowledge of a substantial risk of serious harm. *Farmer*, 511 U.S. at 842.

Here, Plaintiff does not plead enough facts to state a claim to relief that is plausible on its face. Plaintiff says there was no hot water and that one cell was filthy and smelled like urine for about five days until he received his property. Yet he does not allege he suffered physi-

16

cal harm as a result of the conditions of his confinement, and some of the conditions were only temporary. *See Harris v. Fleming*, 839 F.2d 1232, 1235–36 (7th Cir.1988) ("Inmates cannot expect the amenities, conveniences and services of a good hotel … "). Regarding the temperature in Plaintiff's cells, prisoners have a right under the Eighth Amendment to be free from extreme hot and cold temperatures. *Shelby Cnty. Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir.1986). "But the Constitution does not give inmates the right to be free from all discomfort." *Id.* Plaintiff only says his cell was extremely cold one night, and unnaturally cold, and that one time he was denied an extra blanket. He does not provide any further information. At most, the Court can conclude that Plaintiff's cell was uncomfortable, but that does not state a claim for cruel and unusual punishment. *See Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir.1997) ("[J]ust because low temperature forces a prisoner to bundle up indoors during winter does not mean that prison conditions violate the Eighth Amendment"); *Mays v. Springborn*, 575 F.3d 643, 648–49 (7th Cir.2009) (Prisoner's complaint about inadequate winter clothing "did not show that he was forced to be in the cold for long periods of time or that he suffered anything more than the usual discomforts of winter.").

Regarding the rusty water, Plaintiff says when his cellmate put a rag in the spout of the sink, about two days later the rag was rust colored. It took two days of constantly running water to discolor the rag, though. And Plaintiff does not suggest the water was unsafe to drink, only that he was afraid to drink it. *See Bellezza v. Fischer*, 2006 WL 3019760, at *4 (S.D.N.Y. Oct. 24, 2006) (finding water "as dark as coffee" that could not be used for drinking or bathing without extreme discomfort could violate the Eighth Amendment). The Court does not find that the water, as described, resulted in an unquestioned and serious deprivation of basic human needs or that it deprived him of the minimal civilized measure of life's necessities.

Plaintiff further alleges that Butcher retaliated against him, by delaying maintenance of Plaintiff's cell, because Plaintiff had filed grievances about his cell conditions. He asked Butcher, "Since I wrote a grievance you won't fix the problem?" Butcher answered, "Yep." But Butcher was telling Plaintiff to submit a work order to have maintenance done, not a grievance. He did not work on grievances. Butcher also said everything was running perfectly. Moreover, Lt. Stuck told Plaintiff that everyone was complaining of the same thing. Given the allegations, the Court finds that Plaintiff does not plead factual content that allows the Court to draw the reasonable inference that Butcher was retaliating against Plaintiff or that he was deliberately indifferent to Plaintiff's health or safety. Accordingly, Plaintiff's claim in Count 5 stating that he was subjected to inhumane living conditions is dismissed without prejudice.

**Count 6: Destruction of Grievances and Mail; Denial of Access to the Courts**

Lastly, in Count 6, plaintiff accuses counselors Vaughn and Reese of destroying grievances, tampering with his mail, and denying him access to the courts. (He also accuses Butcher of retaliation; that claim was addressed above in Count 5.)

Counselor Vaughn questioned Plaintiff's method of filling out grievance forms. Plaintiff had marked numerous issues on one form. Vaughn said different issues needed to be on separate forms. Plaintiff responded that there were 12 boxes to check on each form, so he checked the ones that applied. Vaughn became belligerent and "threatened" to take six months to process plaintiff's grievances ("Well you can then wait six months for me to answer all these issues!") (Doc. 16, p. 29). He also said he had a surprise for Plaintiff about his transfer. Later, a grievance officer said no grievances had been filed. Plaintiff believes Vaughn destroyed them.

While in the law library, Plaintiff saw Counselor Reese retrieve grievances and mail from a gray box. He saw Reese open and read the contents of a blue parcel, which was a request for copies Plaintiff had sent to the law library. The library later told him it didn't receive his request. Plaintiff also sent a letter about the contaminated water to government officials and more requests for copies of discovery motions to the library. He sent a parcel to his attorney containing "his complaint," a letter to government officials, and a water sample; but only a few documents and "basically an empty parcel" made it to his attorney. He says the interference with his mail resulted in his being left in the conditions he was complaining about until his transfer.

Prison grievance procedures are not constitutionally mandated and thus do not implicate the Due Process Clause per se. As such, the alleged mishandling of grievances "by persons who otherwise did not cause or participate in the underlying conduct states no claim." *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir.2011); *see also Grieveson v. Anderson*, 538 F.3d 763, 772 n. 3 (7th Cir.2008); *George v. Smith*, 507 F.3d 605, 609 (7th Cir.2007); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir.1996). Plaintiff's allegation that Vaughn and Reese destroyed his grievances therefore does not state a claim. That is the only claim in Count 6 against Vaughn.

The allegations concerning denial of access to the courts only mention that Plaintiff sent requests for copies to the law library and a parcel containing a complaint to his attorney. Plaintiff's allegations fail because he has not made any showing of prejudice to a legal claim, as required for a claim of denial of access to the courts. *See Ortiz v. Downey*, 561 F.3d 664, 671 (7th Cir.2009); *Campbell v. Clarke*, 481 F.3d 967, 968 (7th Cir.2007). Plaintiff does not say what underlying legal action he was trying to pursue. He was able to file this lawsuit, so he was not prejudiced in this one, even though he might have been delayed in filing it. In addition, Plaintiff only saw Reese open a blue parcel intended for the law library. Reese did not handle the parcel

containing the complaint, which was intended for Plaintiff's attorney. Plaintiff must show that Reese was personally responsible for a constitutional deprivation. Accordingly, Plaintiff fails to state a claim concerning denial of access to the courts. Count 6 is dismissed without prejudice.

**Pending motions**

The Court **GRANTS** Plaintiff's motions for status (Docs. 29, 31); this Memorandum and Order gives him the status of his case. The Court **DENIES** Plaintiff's motion seeking Chief Judge Herndon's response to Plaintiff's complaint (Doc. 37).

Plaintiff moves to supplement his amended complaint with Exhibits AAA, BBB, and CCC (Doc. 19). Exhibit AAA contains responses to his grievances; Exhibit BBB supports Plaintiff's claims of injuries and virus infection; Exhibit CCC contains medical reports. It is not necessary to submit such material at the pleadings stage of a civil-rights action. Furthermore, Local Rule 15.1 does not permit amendment by interlineation or by reference. Plaintiff will be free to file his exhibits at the appropriate time, such as in opposition to a motion for summary judgment. *See* Fed. R. Civ. P. 56(e). The Clerk is **DIRECTED** to return to Plaintiff a copy of the exhibits associated with this motion. Plaintiff's motion to supplement (Doc. 19) is **DENIED**.

Plaintiff has been granted pauper status, so his motion for service at government expense (Doc. 30) is **DENIED** as moot. Defendants will be served as ordered below.

**Disposition**

IT IS HEREBY ORDERED that **COUNTS THREE, FIVE,** and **SIX** fail to state a claim upon which relief can be granted, and thus are **DISMISSED without prejudice.** Defendants **RYKER, HODGES, BLEVINGS, JARRAD, CLEVY, VAUGHN, REESE,**

**CASHBURN, JOHNSON, AUSHBROOK, KESSEL, WALTERS, OCHS, STUCK,** and **BUTCHER** are **DISMISSED** from this action **without prejudice**.

**COUNTS ONE, TWO,** and **FOUR** shall receive further consideration.

The Clerk of Court shall prepare for Defendants **CAMPANELLA, MARTIN, CUNNINGHAM, GOBLE, REED, KIMMEL, CUSICK, HIGGINS, DOWNEN,** and **LINE**: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the amended complaint (Doc. 16), and this Memorandum and Order to each Defendant's place of employment as identified by Plaintiff. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that Defendant, and the Court will require that Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

With respect to a Defendant who no longer can be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Plaintiff shall serve upon Defendants (or upon defense counsel once an appearance is entered), a copy of every pleading or other document submitted for consideration by the Court. Plaintiff shall include with the original paper to be filed a certificate stating the date on which a true and correct copy of the document was served on Defendants or counsel.  Any paper

received by a district judge or magistrate judge that has not been filed with the Clerk or that fails to include a certificate of service will be disregarded by the Court.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to United States Magistrate Judge Williams for further pre-trial proceedings.

Further, this entire matter is **REFERRED** to United States Magistrate Judge Williams for disposition, as contemplated by Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *should all the parties consent to such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under § 1915, Plaintiff will be required to pay the full amount of the costs, notwithstanding that his application to proceed *in forma pauperis* has been granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that at the time application was made under 28 U.S.C. § 1915 for leave to commence this civil action without being required to prepay fees and costs or give security for the same, Plaintiff was deemed to have entered into a stipulation that the recovery, if any, secured in the action shall be paid to the Clerk of the Court, who shall pay therefrom all unpaid costs taxed against Plaintiff and remit the balance to Plaintiff. Local Rule 3.1(c)(1).

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs. Failure to comply with this order will

cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* Fed. R. Civ. P. 41(b).

**IT IS SO ORDERED.**

**DATED: August 27, 2012**

<u>**/s/ MICHAEL J. REAGAN**</u>
**MICHAEL J. REAGAN**
**United States District Judge**